UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: FEB 2 8 2017

Christopher E. Dervan,

                    Plaintiff,

          —v—

Gordian Group LLC,

                    Defendant.

16-CV-1694 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Christopher E. Dervan ("Plaintiff" or "Dervan") brings this diversity action against his former employer, Gordian Group LLC ("Defendant" or "Gordian"), asserting claims for breach of the parties' December 2010 severance agreement (the "Agreement") and unjust enrichment.  Before the Court is Gordian's motion to dismiss Dervan's Second Amended Complaint, Dkt. No. 17 ("SAC").  For the reasons set forth below, Gordian's motion is GRANTED in part and DENIED in part.

## I.     Background

Unless otherwise noted, the following facts are taken from the SAC or from the Agreement, which is attached as Exhibit 1 to the SAC, *see* Dkt. No. 17-1.

Dervan was employed by Gordian, an investment bank, as an Associate and then a Vice President from July 24, 2006 to December 17, 2010.  SAC ¶ 5.  In connection with Dervan's departure from the firm, the parties entered into the Agreement, which was memorialized in a December 23, 2010 letter from Gordian's President, Peter S. Kaufman, to Dervan.  SAC ¶ 6.

1

The Agreement sets forth terms by which Gordian would continue to provide Dervan with certain monetary compensation and benefits following the termination of his employment. Agreement at 1.  As relevant here, Paragraph 2 of the Agreement provides:

> If you [(Dervan)] choose to continue to work with us [(Gordian)] as an outside consultant in regards to Thermacell through the closing of any transaction that generates a fee, then you will be entitled to 25% of any such fees received by us.

SAC ¶ 7; Agreement ¶ 2.  The terms "work," "consultant," and "transaction" as used in Paragraph 2 are neither defined nor otherwise clarified in the Agreement.  The word "Thermacell," as used in Paragraph 2, is also not defined in the Agreement, but is alleged by Dervan to refer to "certain technology and related products and businesses using that technology then owned by The Schawbel Corporation."  SAC ¶ 7.

The Agreement does not expressly require Dervan to maintain or acquire any license or other regulatory authority or clearance in connection with performing any of the "work" referenced in Paragraph 2.  *See generally* Agreement; *see also* SAC ¶ 15.  The Agreement contains a merger clause, which provides that the terms of the Agreement are limited to those set forth within the four corners of the written instrument and that no extrinsic materials or prior negotiations or agreements constitute part of the contract between the parties.  Agreement ¶ 14.

Following the termination of his employment, Dervan did in fact choose to work as an outside consultant to Gordian with regard to Thermacell.  SAC ¶ 8.  Dervan alleges that in that capacity he provided "valuable services, as appropriate and as requested by Defendant."  SAC ¶¶ 8-9.  The SAC does not describe Dervan's services in any detail, other than to allege that they did not involve "interact[ing] with customers or potential investors regarding the offer or sale of securities."  *Id.* ¶ 17.

2

During the course of his post-termination work for Gordian, Dervan was not registered as a broker-dealer under Section 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act") or otherwise registered in any way with the Financial Industry Regulatory Authority ("FINRA"). *Id.* ¶ 16. It is alleged that Gordian was contemporaneously aware of that fact, and did not suggest that Dervan was in any way required to be so registered or that registration was a condition to Dervan receiving compensation pursuant to the Agreement. *Id.*

Dervan's work ultimately helped Gordian to close a transaction in approximately July 2014 by which an entity affiliated with the private equity firm Kinderhook Industries acquired The Schawbel Corporation's "Thermacell Mosquito business" (the "Thermacell Transaction"). *Id.* ¶¶ 9-10. Dervan alleges on information and belief that Gordian was paid a fee of $1.25 million or more upon closing of the Thermacell Transaction. *Id.* ¶ 11. Dervan demanded that Gordian pay him twenty-five percent of that fee pursuant to the Agreement, but Gordian refused. *Id.* ¶ 13.

Dervan initiated this action on March 5, 2016, asserting claims for breach of contract and unjust enrichment. Dkt. No. 1. Gordian now moves pursuant Federal Rule of Procedure 12(b)(6) to dismiss Dervan's SAC in its entirety. Gordian argues principally (i) that the SAC inadequately pleads Dervan's own performance under the Agreement, (ii) that Dervan's failure to register with FINRA renders enforcement of the Agreement's terms illegal, thereby precluding both a breach of contract claim and an unjust enrichment claim arising from the same facts, and (iii) that the unjust enrichment claim is, in any event, impermissibly duplicative.

3

## II.    Discussion

### A.    Standard of Review

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (additional internal quotation marks omitted).

In deciding a motion to dismiss, a court is required to "accept[] the complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiff's favor." *Steginsky v. Xcelera, Inc.* 741 F.3d 365, 368 (2d Cir. 2014).  It should not, however, give "effect to legal conclusions couched as factual allegations." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).  At the pleading stage, the court generally "must limit its analysis to the four corners of the complaint." *Vassilatos v. Ceram Tech Int'l Ltd.*, 92-cv-4574, 1993 WL 177780, at *5 (S.D.N.Y. May 19, 1993) (citing *Kopec v. Coughlin*, 922 F.2d 152, 154-55 (2d Cir. 1991)).  However, it may "consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in

4

bringing suit.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal

alterations omitted) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

Here, accordingly, the Court may consider the Agreement, which as noted is attached as Exhibit

1 to the SAC.

### B.    Dervan Fails to Plausibly Allege His Own Performance Under the Agreement

Gordian argues that the SAC fails to adequately plead Dervan's own performance under

the Agreement.  Specifically, Gordian maintains that the SAC is devoid of "well-pleaded facts

providing even the most basic description of the services [Dervan] supposedly performed" for

Gordian and, furthermore, that it does not specifically allege that Dervan provided any such

services "through the closing" of the Thermacell Transaction, as purportedly required to merit

compensation under the express terms of the Agreement. *See* Defendant Gordian's

Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Second Amended

Complaint, Dkt. No. 20 ("Br."), at 3-4.

Dervan responds primarily that his own performance under the Agreement is a "condition

precedent" to suit and therefore may be "allege[d] generally" under Federal Rule of Civil

Procedure 9(c).  Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to

Dismiss the Second Amended Complaint, Dkt. No. 24 ("Opp."), at 6-7.  As such, Dervan

maintains, allegations that he "serv[ed] as an outside consultant with Defendant in regard to

Thermacell" and "provided valuable services, as appropriate and as requested by Defendant,"

SAC ¶ 9, along with the general averment that "[a]ll conditions precedent to Defendant's

contractual obligation to pay Plaintiff his twenty-five percent share of the fees received from the

[Thermacell Transaction] have occurred," *id.* ¶ 20, are sufficient to survive a motion to dismiss.

Opp. at 5-7. The unmistakable, if implicit, premise of Dervan's argument is that, by virtue of Rule 9(c), conditions precedent are subject to a lesser pleading requirement than the plausibility standard embodied in Rule 8(a). The Court disagrees.

Several preliminary matters are not disputed. In order to successfully state a claim for breach of contract under New York law,[1] a complaint must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks omitted). "Although the substantive merits of any contract claim[] are governed by New York law, any pleading requirements are governed by federal law, which controls procedural matters in diversity cases." *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 647 (E.D.N.Y. 2012); *see also Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) ("federal pleading rules and standards . . . prevail in all civil actions, including diversity litigation") (internal quotation marks and citations omitted). Federal Rule of Civil Procedure 9(c) provides that "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed. But when denying that a condition precedent has occurred or been performed, a party must do with particularity." Fed. R. Civ. P. 9(c). When a contract expressly makes

---

[1] The Agreement contains an express choice-of-law clause providing that it "shall be governed by and construed under the internal laws of the State of New York without regard to principles of conflicts of law." Agreement ¶ 13. Both parties appear to assume in their briefing that New York law indeed governs the Agreement. Accordingly, the Court will apply New York law. *See, e.g., Texaco A/S v. Commercial Ins. Co.*, 160 F.3d 124, 128 (2d Cir. 1998) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.") (internal quotation marks omitted).

payment by the defendant contingent on the plaintiff's performance of specified services – as does the Agreement at issue here – the plaintiff's performance qualifies as a condition precedent. *See, e.g., Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690, 660 N.E.2d 415, 418, 636 N.Y.S.2d 734, 737 (1995) ("[a] condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises") (internal quotation marks omitted); *cf. Allis-Chalmers Mfg. Co. v. Malan Const. Corp.*, 30 N.Y.2d 225, 231 n.4, 282 N.E.2d 600, 602, 331 N.Y.S.2d 636, 639 (1972) (rejecting argument that the term "conditions precedent," as used in the pleading rules set forth in CPLR 3015, "has reference to conditions precedent to the existence of a contract" but "not as to one party's performance under the contract"); 22 N.Y. Jur. 2d Contracts § 262 (2d ed. 2017) ("If one covenant precedes performance of the other, or is concurrent therewith, and is necessary or proper to enable the other to be performed, or relates to such performance, it or its performance is a condition precedent."). Therefore, by the plain terms of Rule 9(c), Dervan's own performance may indeed, as he suggests, be "alleged generally."

The critical question, however, is precisely what that means.

Since the Supreme Court established the plausibility pleading standard under Federal Rule of Civil Procedure 8(a) in *Twombly* and *Iqbal*, courts in this Circuit have largely, although not uniformly, taken the view urged by Dervan – that is, notwithstanding the seemingly broadly applicable requirements of Rule 8(a), only "at most, a general averment to the satisfaction of any conditions precedent" is required to withstand a motion to dismiss under Rule 12(b)(6). *Superior Site Work, Inc. v. Nasdi, LLC*, 14-cv-1061, 2016 WL 526238, at *6 (E.D.N.Y. Feb. 9, 2016) (internal quotation marks omitted); *see also In re Residential Capital, LLC*, 524 B.R. 563, 584

7

(Bankr. S.D.N.Y. 2015) ("Courts in the Second Circuit are largely in agreement that a general allegation that all conditions precedent have been met is sufficient to satisfy Rule 9(c).") (internal quotation marks and alteration omitted); *Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, 13-cv-1725, 2013 WL 3835191, at *3 (S.D.N.Y. Jul. 25, 2013) ("In this Circuit, a general allegation that all conditions precedent have been met . . . is sufficient to satisfy Rule 9(c)"); *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 647 (E.D.N.Y. 2012) (collecting cases and noting that "it is clear that even where courts require allegations in the complaint with regard to the satisfaction of conditions precedent, courts have consistently accepted only general averments of their fulfillment"). The Court of Appeals has not interpreted Rule 9(c) in the wake of *Twombly* and *Iqbal*; indeed, "there is scant binding case law in this Circuit regarding [Rule 9(c)]" more generally. *Superior Site Work*, 2016 WL 526238, at *6; *see also Mendez*, 840 F. Supp. 2d at 648 ("There is little case law in this Circuit regarding this particular provision of the Federal Rules."); *Ackerley Media Gr., Inc. v. Sharp Elecs. Corp.*, 170 F. Supp. 2d 445, 453 (S.D.N.Y. 2001) ("Perhaps because [the] language [of Rule 9(c)] is so straightforward, there is relatively little case law interpreting this rule. The court knows of no Second Circuit case passing on the matter. . . ."). At least two other courts of appeals, however, have adopted what can only be characterized as the prevailing view among the District Courts of this Circuit. *See Hildebrand v. Allegheny Cty.*, 757 F.3d 99, 112 (3d Cir. 2014) (under Rule 9(c), "the pleading of conditions precedent falls outside the stricture of *Iqbal* and *Twombly*"); *Myers v. Central Fla. Invs., Inc.*, 592 F.3d 1201, 1224 (11th Cir. 2010) (post-*Twombly*/*Iqbal* decision concluding that plaintiff's "general statement" that she had "fulfilled all conditions precedent to institution of this action" was "sufficient to discharge her duty under

Rule 9 of the Federal Rules of Civil Procedure").

The analytic rationale for this conclusion, to the extent it is expressly articulated in the case law, would appear to be neatly summarized in the Third Circuit's *Hildebrand* decision:

> *Iqbal* and *Twombly* interpreted Federal Rule of Civil Procedure 8(a), which governs the standard for pleading a claim for relief. The pleading of conditions precedent is governed by Rule 9(c), not Rule 8(a). Neither *Iqbal* nor *Twombly* purport to alter Rule 9. We see no indication that those cases sought to override the plain language of Rule 9(c) . . . .

*Hildebrand*, 757 F.3d at 112.

It is of course correct that *Twombly* and *Iqbal* concern, first and foremost, the plausibility requirement of Rule 8(a). But this reasoning, in the Court's view, overlooks a lesser-discussed portion of *Iqbal* that carries critical implications for the instant question. Specifically, the *Iqbal* Court had occasion, near the conclusion of the majority opinion, to construe Rule 9(b), a provision with notable similarities to Rule 9(c). Rule 9(b) provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). Expressly rejecting an argument that Rule 9(b)'s "alleged generally" language constitutes a carve-out from the requirements of Rule 8(a) and permits "conclusory allegation[s]" of mental conditions, the Court explained:

> '[G]enerally' is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid – though still operative – strictures of Rule 8. . . . And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss.

*Iqbal*, 556 U.S. at 686-87 (internal citation omitted). Accordingly, the Supreme Court held, the bare allegation that "petitioners discriminated against him on account of his religion, race, and/or national origin and for no legitimate penological interest" failed to set forth sufficient facts "to state a claim for purposeful and unlawful discrimination." *Id.* (internal quotation marks omitted).

The Second Circuit, relying on this reasoning, recently deemed it "clear" that "Rule 9(b)'s language notwithstanding, Rule 8's plausibility standard applies to pleading intent." *Biro*, 807 F.3d at 544-45 (concluding that "[i]t follows that malice must be alleged plausibly in accordance with Rule 8"). Other Circuits have echoed that view. *See, e.g.*, *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) ("States of mind may be pleaded generally, but a plaintiff still must point to details sufficient to render a claim plausible."); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("[M]alice must still be alleged in accordance with Rule 8—a 'plausible' claim for relief must be articulated.")

The Court sees no principled basis on which to afford Rule 9(c) – an adjacent subsection whose structure substantially mirrors that of Rule 9(b) – a divergent reading. Like Rule 9(b), Rule 9(c) employs the word "generally" in one sentence as a point of differentiation from a "particularity" requirement set forth in that sentence's immediate neighbor. Put differently, "generally" is used in Rule 9(c) as a "relative term," serving to exempt allegations that conditions precedent have been performed not from the baseline plausibility requirement of Rule 8(a) but rather only from the "elevated" standard for denials of such performance established in the second half of the Rule. *Iqbal*, 556 U.S. at 686-87

In a thoughtful and persuasive decision, Judge Davis of the Eastern District of Virginia

10

reached a similar conclusion. *Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, 995 F. Supp. 2d 512, 516-17 (E.D. Va. 2014).   In his view, an analysis of the text of Rules 9(b) and 9(c) "reveals more similarity than difference," and "[t]he fact that these adjacent subsections within Rule 9 contain virtually indistinguishable language suggests that the pleading requirements should likewise be indistinguishable." *Id.* at 517.   Such a conclusion, the court noted, while likely "against the weight of lower court case law," is "arguably dictated by the analysis in *Iqbal*." *Id.*[2]   This Court agrees, and holds that the occurrence or performance of a condition precedent – to the extent that it need be pled as a required element of a given claim – must be plausibly alleged in accordance with Rule 8(a). *See id.* at 517-18; *see also Napster, LLC v. Rounder Records Corp.*, 761 F. Supp. 2d 200, 208-09 (S.D.N.Y. 2011) (deeming allegation that plaintiff "has performed all of the terms and conditions required to be performed by it under the 2006 Agreement" an insufficient "legal conclusion," and recognizing that cited cases suggesting that such "general statement[s]" are sufficient under Rule 9(c) "all predate *Twombly* and *Iqbal*") (internal quotation marks omitted).

Applying that rule here, the Court concludes that Dervan has failed to plausibly allege his own performance under the Agreement.  As discussed, the Agreement provides that should Dervan "choose to continue to work with [Gordian] as an outside consultant in regards to Thermacell through the closing of any transaction that generates a fee," then he would be "entitled to 25% of any such fees received by [Gordian]." SAC ¶ 7; Agreement ¶ 2. In pleading the performance of his own obligations, Dervan avers only that (i): since his termination he "has

---

[2] Judge Davis ultimately "[a]ssum[ed], without deciding, that the Supreme Court's interpretation of the language in Rule 9(b) extends to the nearly identical language in Rule 9(c), thus requiring more than a conclusory statement indicating that 'all conditions precedent have been satisfied.'" *Id.* at 517.

chosen to work with Defendant as an outside consultant in regard to Thermacell"; (ii) in that

capacity, he "provided valuable services"; (iii) the "Thermacell engagement" (a term that is not

defined in the SAC) "resulted in the closing" of the Thermacell Transaction; and (iv) that "[a]ll

conditions precedent to Defendant's contractual obligation to pay Plaintiff" under the Agreement

"have occurred." SAC   ¶¶ 8-10, 20. These "threadbare" and, at least in part, conclusory

statements do not provide the "sufficient factual matter" required for the Court "to draw the

reasonable inference" that Dervan performed the sort of work that would entitle him to payment

under the Agreement.[3]  *See Iqbal*, 556 U.S. at 678; *see also Swan Media Group, Inc. v. Staub*,

841 F. Supp. 2d 804, 808 (S.D.N.Y. 2012) (plaintiff's "conclusory[]"assertion that it "performed

all of its obligations under the Agreement" failed "to sufficiently allege its adequate performance

under the Agreement"); *Napster*, 761 F. Supp. 2d at 208 (allegation that plaintiff "has performed

all of the terms and conditions required to be performed by it under the 2006 Agreement" was

insufficient "legal conclusion"); *cf. Comfort Inn Oceanside v. Hertz Corp.*, 11-cv-1534, 2011

WL 5238658, at *3 (E.D.N.Y. Nov. 1, 2011) ("Absent allegations of the claimant's own

performance, the claimant has alleged facts showing the mere possibility of misconduct, but not

that it is entitled to relief.") (internal quotation marks omitted).

---

[3] Dervan appears to suggest in passing that the only performance required of him in order to merit compensation under the Agreement was "choos[ing]" to work with Gordian as an outside consultant – as opposed, it would seem, to actually performing the work itself. Opp. at 5. Accordingly, Dervan appears to maintain, the allegation that he made that "choice" suffices to withstand Gordian's motion. *Id.* To extent that Dervan takes this position, it is thoroughly unavailing. The Court cannot accepted such a strained reading of the Agreement, however inartfully drawn that instrument may be. Dervan's interpretation would require Gordian to pay 25% of its fees simply for making some abstract "choice" about his own employment, even if no services were actually rendered to Gordian. Under New York law, a "contract should not be interpreted to produce a result that is absurd" or "commercially unreasonable," or in such a way that "would give one party an unfair and unreasonable advantage over the other" or "place one party at the mercy of the other." *Luver Plumbing & Heating, Inc. v. Mo's Plumbing & Heating*, 144 A.D.3d 587, 588, 43 N.Y.S.3d 267, 269 (N.Y. App. Div. 2016) (internal quotation marks and alterations omitted). Dervan's suggested construction runs afoul of these well-established principles.

For these reasons, Gordian's motion to dismiss Dervan's breach of contract claim is GRANTED.

## C.     Dismissal of the Unjust Enrichment Claim is Unwarranted

Dervan also asserts a claim for unjust enrichment under New York law. SAC ¶¶ 22-24. "An unjust enrichment claim is rooted in the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516, 973 N.E.2d 743, 746, 950 N.Y.S.2d 333, 336 (2012) (internal quotation marks and citations omitted). The "theory of unjust enrichment lies as a quasi-contract claim, and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Id.* (internal quotation marks omitted). Accordingly, the required elements of an unjust enrichment claim "are that the defendants were enriched, at the plaintiff's expense, and that it is against equity and good conscience to permit the defendants to retain what is sought to be recovered." *Cty. of Nassau v. Expedia, Inc.*, 120 A.D.3d 1178, 1180, 992 N.Y.S.2d 293, 296 (N.Y. App. Div. 2014). "[T]he doctrine of unjust enrichment does not require wrongful conduct by the one enriched, only that the enrichment be unjust." *Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 179 A.D.2d 592, 593 579 N.Y.S.2d 353, 354 (N.Y. App. Div. 1992) (internal quotation marks and citations omitted).

Gordian does not attack the sufficiency of Dervan's pleading on this claim. Instead, it argues that dismissal is appropriate for two independent reasons. First, Gordian contends that the Agreement is illegal and unenforceable as a matter of law, and that this illegality precludes not only a direct breach of contract claim but also an equitable claim substantially "aimed at enforcing the tainted contract." Br. at 8. Second, it maintains that if the Agreement is legal, then

13

it exclusively governs the subject matter of this lawsuit and the unjust enrichment claim is impermissibly duplicative of the breach of contract claim.  Br. at 9.  Neither of these contentions presents appropriate grounds for dismissal.

### 1.    On the Record Before the Court, Neither the Agreement Nor Dervan's Alleged Performance Is Illegal

Gordian's first argument – that Dervan may not pursue an unjust enrichment claim "that stems from the same factual allegations that show an illegal and unenforceable contract," Br. at 8 (internal quotation marks omitted) – requires the Court to assess the legality of the Agreement, notwithstanding its dismissal of the direct breach of contract claim.  The basis of Gordian's illegality contention is that Dervan, as conceded in the SAC, was not registered as a broker-dealer under Section 15(a) the Exchange Act, or otherwise registered with FINRA, at the time that he performed consulting services for Gordian.  This lack of registration, according to Gordian, necessarily renders the Agreement violative of the federal securities laws and, accordingly, unable to support a plausible claim to relief, whether legal or equitable.   Br. at 4-8. While discovery may ultimately lend factual support to Gordian's contention, the Court cannot conclude on the limited record before it at the pleading stage – when all reasonable inferences must be drawn in Dervan's favor – that the Agreement is *per se* unenforceable.  Accordingly, even spotting Gordian the proposition that an illegal contract would in fact preclude an unjust enrichment claim, dismissal of Dervan's unjust enrichment claim on public policy grounds is unwarranted at this stage.

"Under New York law, a valid contract must be supported by consideration and include mutual assent, legal capacity and legal subject matter." *Jones-Soderman v. Mazawey*, 09-cv-3185, 2010 WL 54759, at *5 (S.D.N.Y. Jan. 6, 2010) (citing *Murray v. Northrop Grumman Info.*

14

*Tech., Inc.*, 444 F.3d 169, 178 (2d Cir. 2006)).  "Ordinarily, a contract with illegal subject matter

is considered void," and no claim arises from its purported breach. *Foundation Ventures, LLC v.*

*F2G, LTD.*, 08-cv-10066, 2010 WL 3187294, *4 (S.D.N.Y. Aug. 11, 2010); *see also Kaiser-*

*Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843 (2d Cir. 1952) ("[A] contract which violates the

laws of the United States and contravenes the public policy as expressed in those laws is

unenforceable."); *Scotto v. Mei*, 219 A.D.2d 181, 183, 642 N.Y.S.2d 863, 865 (N.Y. App. Div.

1996) ("[I]t is black-letter law that a contract entered into in violation of a statute is an unlawful

undertaking and such an illegal contract cannot give rise to a viable cause of action.") (internal

citation omitted); *Sirota v. Champion Motor Gr., Inc.*, 18 Misc.3d 862, 866, 849 N.Y.S.2d 426,

430 (N.Y. Sup. Ct. 2008) ("It is well settled that a contract which violates a prohibitory statute or

which cannot be performed without violation of that statute is an unlawful undertaking and is

illegal, void, and unenforceable.") (internal citations omitted).[4]  Asserting illegality to avoid

enforcement of a contract constitutes an affirmative defense, and the burden is ultimately on the

proponent to prove the elements of the defense.  *See, e.g., Deitrick v. Gypsy Guitar Corp.*, 16-cv-

616, 2016 WL 7494881, at *8 (S.D.N.Y. Dec. 28, 2016); *see also Barton Grp., Inc. v. NCR*

*Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) ("[A] defendant asserting an affirmative

defense bears the burden of proof with respect to that defense."), *aff'd*, 476 Fed. App'x 275 (2d

Cir. 2012) (Summary Order); *Brignoli v. Balch, Hardy & Scheinman, Inc.*, 178 A.D.2d 290, 290-

91, 577 N.Y.S.2d 375, 375 (N.Y. App. Div. 1991) (in breach of contract action, "[t]he defendant

---

[4] The New York Court of Appeals has recognized a limited exception to this general rule "where contracts which violate statutory provisions are merely *malum prohibitum*," the "statute does not expressly provide that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy." *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 127, 603 N.E.2d 246, 247, 589 N.Y.S.2d 396, 397 (1992) (internal quotation marks and brackets omitted).

bears the burden of proof on an affirmative defense"); N.Y.C.P.L.R. § 3018(b) (listing "illegality either by statute or common law" as an affirmative defense).

In advancing its illegality argument, Gordian relies on Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b). Br. at 7-8. Section 29(b) provides in relevant part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . . as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .

15 U.S.C. § 78cc(b). Notwithstanding the provision's facially broad language, courts have interpreted it to mean that "[c]ontracts made in violation of Section 29(b) are not void *per se*; rather they 'voidable at the option of the innocent party.'" *Foundation Ventures*, 2010 WL 3187294, at *6 (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 387-88 (1970)). Only "an unwilling innocent party" may invoke Section 29(b) to challenge a contract. *Mills*, 396 U.S. at 387; *see also Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 892, 906 (W.D.N.Y. 1983) (deeming party that "willingly entered into the questioned contract and knew of all the facts which [were now claimed] to constitute manipulation" not an "'unwilling innocent'"), *aff'd*, 717 F.2d 757 (2d Cir. 1983). The Supreme Court has concluded that Section 29(b) confers affirmative rescissory rights upon "unwilling innocents," *Mills*, 396 U.S. at 388, and several courts of appeals have recognized that it also may be raised "defensively" – as it has been here – in order "to preclude enforcement of a contract." *See Costello v. Grundon*, 651 F.3d 614, 625-26 (7th Cir. 2011); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 203-07 (3d Cir. 2001); *see also Schatzki v. Weiser Capital Mgmt. LLC*, 10-cv-4685, 2016 WL 6662264, at *4-7 (S.D.N.Y.

Nov. 9, 2016).

Whether invoked in an action to rescind or as an affirmative defense to an enforcement

claim, a Section 29(b) argument must be predicated on an underlying violation of the Exchange

Act or a regulation promulgated thereunder. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 722 (2d

Cir. 1998); 15 U.S.C. § 78cc(b).  Here, Gordian maintains that the Agreement violates two

specific regulations: FINRA Rule 2040 and National Association of Securities Dealers

("NASD") Rule 1031.  Br. at 5-7.

FINRA, the successor to NASD, "is a self-regulatory organization and national securities

association that is registered with the Securities Exchange Commission ('SEC')." *WC Capital*

*Mgmt., LLC v. UBS Secs., LLC*, 711 F.3d 322, 326 n.2 (2d Cir. 2013).  It "regulates member

brokerage firms and exchange markets, subject to oversight by the SEC," and is required by the

Exchange Act "to promulgate rules 'to prevent fraudulent and manipulative acts and practices'

and to discipline its members when they violate those rules." *Mathis v. SEC*, 671 F.3d 210, 215

(2d Cir. 2012) (citing 15 U.S.C. §§ 78o–3, 78o–3(b)(6)).

FINRA Rule 2040, approved by the SEC and effective August 24, 2015,[5] provides in

pertinent part:

> No member or associated person shall, directly or indirectly, pay any
> compensation, fees, concessions, discounts, commissions or other
> allowances to . . . any person that is not registered as a broker-dealer
> under Section 15(a) of the Exchange Act, but by reason of receipt of
> any such payments and the activities related thereto, is required to
> be so registered under applicable federal securities laws and
> [Exchange Act] rules and regulations . . . .

*See* FINRA Rule 2040(a)-(a)(1).

---

[5] *See* FINRA, Regulatory Notice 15-07 (March 2015).

17

For its part, NASD Rule 1031, which remains in force and has been incorporated into the FINRA Manual, provides in relevant part that "[a]ll persons engaged or to be engaged in the investment banking or securities business of a member who are to function as representatives shall be registered as such with NASD . . . ." NASD Rule 1031(a). "Representative," as used in the rule, is defined as "[p]ersons associated with a member, including assistant officers other than principals, who are engaged in the investment banking or securities business for the member including the functions of supervision, solicitation or conduct of business in securities or who are engaged in the training of persons associated with a member for any of these functions . . . ." NASD Rule 1031(b).

Gordian, a registered broker-dealer and a member of FINRA, argues that the Agreement violates both of these rules and therefore, by extension, Exchange Act Section 29(b).  According to Gordian, the Agreement violates FINA Rule 2040 because it purports to obligate Gordian to pay transaction-based compensation to Dervan, an unregistered individual, in the form of a twenty-five percent share of fees received by the firm following closing of the Thermacell Transaction.  Br. at 5-6.  And it contravenes NASD Rule 1031, Gordian maintains, because the Agreement contemplates Dervan serving as a "representative" of Gordian.  *Id.* at 6-7.  Although there may be real merit to these arguments, the record before the Court does not permit either conclusion at this stage.

### a.      FINRA Rule 2040

Whether a payment to an unregistered individual runs afoul of FINRA Rule 2040 turns, by the plain terms of the Rule, on whether that individual, "by reason of receipt of any such payment[] and the activities related thereto," is "required" to be "registered as a broker-dealer

under Section 15(a) of the Exchange Act." *See* FINRA Rule 2040; *see also* SEC Release No.

73954, 2014 WL 7407470, at \*3 (Dec. 30, 2014) (under then-proposed FINRA Rule 2040,

"persons would look to SEC rules and regulations to determine whether the activities in question

require registration as a broker-dealer under Section 15(a) of the Exchange Act").

Determining whether an individual's activities render that individual a broker – thus

triggering a registration requirement – is often a fact-specific inquiry.  "The Exchange Act

broadly defines 'broker' as one who 'engaged in the business of effecting transactions in

securities for the account of others.'"  *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y.

2003) (quoting 15 U.S.C. § 78c(a)(4)(A)).  In ascertaining whether a particular individual falls

within that definition, courts consider a variety of factors, including whether the individual:

"may be characterized by a certain regularity of participation in securities transactions at key

points in the chain of distribution"; "is an employee of the issuer"; "received commissions as

opposed to a salary"; "is selling, or previously sold, the securities of other issuers"; "is involved

in negotiations between the issuer and the investor"; "makes valuations as to the merits of the

investment or gives advice"; and "is an active rather than passive finder of investors."  *Martino*,

255 F. Supp. 2d at 283 (internal quotation marks omitted) (citing *SEC v. Hansen*, 83-cv-3692,

1984 WL 2413, at \*10 (S.D.N.Y. Apr. 6, 1984)); *see also SEC v. CKB168 Holdings, Inc.*, 13-cv-

5584, 2016 WL 6915859, at \*24 (E.D.N.Y. Sept. 28, 2016) (reciting same factors); SEC, Guide

to Broker-Dealer Registration (April 2008), *available at*

http://www.sec.gov/divisions/marketreg/bdguide.htm, at 4-5 ("SEC Registration Guide") ("In

order to determine whether [an individual] . . . is a broker, we look at the activities that the

person or business actually performs," and ask, for example, whether it "participate[s] in

important parts of a securities transaction, including solicitation, negotiation, or execution of the

transaction," receives "transaction-related compensation," and/or "handle[s] the securities or

funds of others in connection with securities transactions").

"Dealer" is generally defined as a person "engaged in the business of buying or selling

securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. §

78c(a)(5)(A). Whether an individual falls within this definition similarly requires analysis of a

variety of factors, including whether the individual: "advertise[s] or otherwise let[s] others know

that [it is] in the business of buying and selling securities"; "make[s] a market in, or quote[s]

prices for both purchases and sales of, one or more securities"; and/or "provide[s] services to

investors, such as handling money and securities, extending credit, or giving investment advice."

SEC Registration Guide at 5-6.

At this stage, the record is devoid of sufficient factual matter to permit the Court to make

these sorts of circumstance-specific inquires. The Agreement itself does not on its face require

Dervan, concededly an unregistered individual, to act as a "broker" or "dealer." Indeed, as

discussed, the Agreement does not specify any of the services Dervan would perform, any of the

activities in which he would engage, or even the types of transactions in which he would

participate. Instead, it contains only a single a vague reference to "work . . . as an outside

consultant in regards to Thermacell." Agreement ¶ 2; *see also Antares Mgmt. LLC v. Galt*

*Global Capital, Inc.*, 12-cv-6075, 2013 WL 1209799, at *8-9 (S.D.N.Y. Mar. 22, 2013) ("To

find a contract unenforceable for illegality at the pleading stage, the question is whether the

contract 'on its face' requires the unregistered [person] to perform broker services.") (citing

*Sprinzen v. Nomberg*, 46 N.Y.2d 623, 631-32, 389 N.E.2d 456, 459-60, 415 N.Y.S.2d 974, 978-

79 (1979)).   The SAC, for its part, does not allege Dervan's particular role in the Thermacell

Transaction or any services provided or work performed in connection therewith.   As noted, it

avers only that Dervan provided "valuable services" as "requested by Defendant," but that these

services did not involve "interact[ing] with customers or potential investors regarding the offer

or sale of securities."   SAC ¶¶ 9, 17.

The circumstances presented are therefore markedly different than those of *Lawrence v.*

*Richman Gr. of Conn., LLC*, 407 F. Supp. 2d 385 (D. Conn. 2005), the only case Gordian

identifies in which a contract was held unenforceable at the pleading stage based on violations of

broker-dealer registration requirements.   In *Lawrence*, the contract at issue, as alleged by

plaintiff, expressly called for the parties to engage in specific conduct that violated Exchange Act

Section 15(a) as a matter of law.   Specifically, it contemplated that the plaintiff would receive

commissions to "act as [the defendant's] agent in soliciting investors" for real estate limited

partnerships that defendant had created and styled as "investment funds . . . for institutional

investors," even though the defendant was not registered as a broker and the plaintiff was not

registered as defendant's representative.   *Id.* at 386-391.

Gordian also suggests that the payment of transaction-based compensation to Dervan, as

contemplated by the Agreement, would be sufficient in of itself for the Section 15(a) registration

requirement to apply to Dervan as a matter of law (thus rendering the Agreement violative of

FINRA Rule 2040).   Br. at 5-6; Defendant Gordian's Reply Memorandum in Support of Its

Motion to Dismiss Plaintiff's Second Amended Complaint, Dkt. No. 25,  at 2-3.   There is no

doubt that receipt of such compensation militates, perhaps strongly, in favor of a conclusion that

Dervan functioned as a broker-dealer and therefore was required to register.   *See, e.g., Brumberg,*

*Mackey & Wall, P.L.C.*, 2010 WL 1976174, at *1 (S.E.C. No-Action Letter, May 17, 2010) (describing a person's receipt of transaction-based compensation in connection with "effecting transactions in securities, or inducing or attempting to induce the purchase or sale of securities" as "a hallmark of broker-dealer activity" and noting that any person who receives such compensation "typically must register as a broker-dealer").[6] But it is not a categorical rule, and the inquiry remains fact-specific. Indeed, Dervan points the Court to two examples of individuals who may, under certain circumstances, accept transaction-based compensation without registering: (i) so-called "finders," who may collect commissions for purely "locat[ing] potential buyers or sellers, stimulat[ing] interest, and bring[ing] parties together," *Antares*, 2013 WL 1209799, at *7; and (ii) certain persons "engaged in the business of effecting securities transactions solely in connection with the transfer of ownership and control of a privately-held company . . . to a buyer that will actively operate the company or the business conducted with the assets of the company," *M&A Brokers*, 2014 WL 356983, at *1-3 (SEC No-Action Letter, Jan. 31, 2014). While the Court does not, and could not, express any view at this time as to whether Dervan, as a factual matter, qualifies as either of these, it is persuaded that Gordian may not rely on Dervan's contemplated compensation, and nothing more, to carry its burden of demonstrating that the Agreement violated FINRA Rule 2040 at the pleading stage.

### b.      NASD Rule 1031

For similar reasons, the Court concludes that Gordian fails to establish that the Agreement violates NASD Rule 1031 as a matter of law. As noted, Rule 1031 requires "[a]ll

---

[6] While SEC no-action letters are not binding on federal courts, "they are widely regarded as persuasive authority." *Schatzki*, 2016 WL 6662264, at *5; *see also N.Y.C. Emps. Ret. Sys. v. SEC*, 45 F.3d 7, 13 (2d Cir. 1995) ("the court would treat the no-action letter as persuasive").

persons engaged or to be engaged in the investment banking or securities business of a member *who are to function as representatives* shall be registered with NASD. . . ." NASD Rule 1031(a) (emphasis added). A "representative" is any "person[] associated with a member, including assistant officers other than principals, who [is] engaged in the investment banking or securities business for the member including the functions of supervision, solicitation or conduct of business in securities or who [is] engaged in the training of persons associated with a member for any of these functions . . . ." NASD Rule 1031(b). Consistent with the plain terms of the Rule, guidance provided by FINRA – and cited by Gordian – makes clear that whether an individual must register as a representative depends on the particular nature of the individual's involvement in the member firm's individual banking or securities business and the individual's specific job duties. *See, e.g.*, FINRA, Registration and Qualification FAQ, *available at* http://www.finra.org/industry/registration-qualification-exams-faq (explaining that anyone "actively involved" in such businesses, with duties including "supervision, solicitation, or training of persons associated with the member" must register as representative, and that "job performance determines the registration requirement").[7]

Because the record contains no facts explicating Dervan's specific duties under the Agreement or the nature of his involvement in the Thermacell Transaction, the Court is unable to conclude at this stage that Dervan was required – but failed – to register as a representative under Rule 1031.

*     *     *

---

[7] This Court may look to "FINRA's practical application of its own rules" as, at least, persuasive authority. *See UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 652 (2d Cir. 2011).

Although discovery may yield a different result, the Court concludes that the current record does not permit Gordian to carry its burden of showing that the Agreement violated FINRA Rule 2040 or NASD Rule 1031 and is thus illegal and unenforceable under Exchange Act Section 29(b). *See, e.g.*, *Antares*, 2013 WL 1209799, at *8-9 (although "discovery [might] give rise to facts suggesting that plaintiffs were acting as unregistered brokers in violation of Section 29(b)," dismissal was unwarranted because the contract did not "on its face" require unregistered to plaintiffs "to perform broker services" and plaintiffs made no allegations that suggested that they served as brokers in performing under the contract) (internal quotation marks omitted); *Frati v. Saltzstein*, 10-cv-3255, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011) (dismissing claim for rescission under Section 29(b) because no acts were alleged to be reflected in relevant contracts or to have been performed by defendants that would require defendants to be registered as brokers-dealers); *Foundation Ventures*, 2010 WL 3187294, at *6-8 (denying motion to dismiss breach of contract claim on illegality grounds because defendant could not demonstrate on pleading-stage record that plaintiff, as a matter of law, "acted as an unregistered broker in violation of Section 15(a)(1) of the [Exchange Act]"); *cf. Essex Universal Corp. v. Yates*, 305 F.2d 572, 573 (2d Cir. 1962) (summary judgment inappropriate where contested contractual provision did not "on its face render the contract illegal and unenforceable"). Because the Court cannot deem the Agreement illegal and unenforceable, Gordian's unjust enrichment argument – which is substantially contingent on an illegality determination – must be rejected at this stage.

Gordian's motion to dismiss the unjust enrichment claim on public policy grounds is DENIED.

 2.    **The Breach of Contract Claim Does Not Bar Dervan from
        Maintaining the Unjust Enrichment Claim at this Stage of the
        Litigation**

Finally, Gordian contends that assuming the Agreement is legal and enforceable, it

exclusively governs the subject matter of Dervan's unjust enrichment claim, rendering that claim

impermissibly duplicative.

It is generally true that "where there is an enforceable written contract governing the

particular subject matter, claims based on quasi-contract theories like unjust enrichment do not

provide a distinct basis for recovery." *Vitrano v. State Farm Ins. Co.*, 08-cv-103, 2008 WL

2696156, at *3 (S.D.N.Y. Jul. 8, 2008). Nevertheless, although "Plaintiffs can ultimately recover

on only one of their two claims for breach of contract and unjust enrichment, courts in this

district have routinely allowed plaintiffs to advance past the pleading stage on an alternate theory

of unjust enrichment." *Next Commc'ns, Inc. v. Viber Media, Inc.*, 14-cv-8190, 2016 WL

1275659, at *8 (S.D.N.Y. Mar. 30, 2016); *see also Transcience Corp. v. Big Time Toys, LLC*, 50

F. Supp. 3d 441, 452-53 (S.D.N.Y. 2014) ("courts in this Circuit routinely allow plaintiffs to

*plead* [contract and unjust enrichment] claims in the alternative") (emphasis in original)

(collecting cases); *Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 427 (S.D.N.Y. 2012) ("While a

party generally may not simultaneously recover upon a breach of contract and unjust enrichment

claim arising from the same facts, it is still permissible to plead such claims as alternative

theories.").

Here, of course, it remains unsettled whether an enforceable contract in fact governs the

25

dispute at hand, and, in any event, the Court has dismissed the breach of contract claim as insufficiently pled, avoiding any prospect of impermissible double recovery. As such, the Court sees no reason not to permit Dervan to proceed with the unjust enrichment theory of liability.

Accordingly, Gordian's motion to dismiss the unjust enrichment claim as duplicative is DENIED.

## III.    Conclusion

For the foregoing reasons, Gordian's motion to dismiss the breach of contract claim is GRANTED, and its motion to dismiss the unjust enrichment claim is DENIED. The Court will schedule an initial pretrial conference by separate order.

This resolves Dkt. Nos. 11 and 19.

SO ORDERED.

Dated:  February ___, 2017
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

26